FILED
OCT 2 4 2018
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO.
ST. LOUIS

## AFFIDAVIT

I, Jennifer Drews, being duly sworn, do hereby depose and state:

### I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation and I have worked as such for approximately ten (10) years. My current assignment is with the Public Corruption/Civil Rights Squad where I am detailed to work on various civil rights and human trafficking investigations. I have had numerous contacts and dealings with informants, victims and other individuals known to engage in "prostitution" and sex trafficking related offenses. I also have special training in the area of computer-based investigations. I have investigated and/or assisted in numerous investigations relative to federal cases concerning promoting prostitution and commercial sex-trafficking and related offenses. I have received specialized training in the area of sex trafficking, and have participated in investigations of persons suspected of violating federal sex trafficking laws, including Title 18, United States Code, Sections 1591 (sex trafficking by force, fraud or coercion), 1952 (use of interstate facilities to promote, manage or facilitate prostitution), 2422(a) and 2422(b) (coercion and enticement to engage in prostitution).

2. This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Section 1952, which criminalizes the act of interstate travel to promote, manage, establish or carry on any unlawful activity, including promoting prostitution; Title 18, United States Code, Section 1591(a) and 2, which criminalizes sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense. The evidence of these violations will be found in the following item that is the subject of the search and seizure applied for in this affidavit are more specifically described in Attachment A.

3. The item to be searched, which consists of:

   (a) a Black and Grey LG, Cell Phone, Model: LM-X210MA, Serial Number: 804CYCV809515, IMEI: 356233-09-809515-8, hereinafter "**Cell Phone A**," which is currently in the possession of the Federal Bureau of Investigation, 2222 Market Street, St. Louis, Missouri 63103.

4. The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and other persons. In the course of preparing this affidavit and conducting the present investigation, I have consulted with agents and investigators with specialized training and experience in digital evidence and forensics. The information in this affidavit is submitted for the limited purpose of establishing probable cause in connection with the present application and is not intended as a complete statement of all facts related to the present investigation.

## II.  DEFINITIONS

5.  The following terms have the indicated meaning in this affidavit:

   a. The phrase "records, documents, and materials" as used herein, including those used to facilitate communications, includes all of the listed items of evidence in whatever form and by whatever means such records, documents, or materials may have been created or stored. Those forms and means of storage and creation include but are not limited to any handmade from (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, motion pictures, photocopies); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, and CD-ROMS), as well as printouts or readouts from any magnetic storage device.

   b. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   c. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device) Cellular telephones or any other mobile device.

   d. Electronic data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment.

   e. "Wireless telephone or mobile telephone, or cellular telephone'" as used herein

means is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

### III. CONSIDERATIONS REGARDING DIGITAL EVIDENCE

6. Digital and electronic files may be important to criminal investigations in several ways. In some cases, the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime. Further, the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in various forms of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

7. As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

### CELLULAR AND MOBILE PHONES

8. As used herein, a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

9. In addition to enabling voice communications, typically, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: receiving and storing voice mail messages, storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.

Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

10. An "iPhone" is a brand of handheld wireless electronic communications devices made by Apple Inc. Apple cellular phones generally enable users to send email, make and receive telephone calls, access the Internet, and organize appointments and contact information. iPhones can also send instant messages, take digital pictures or moving video, or store and play digital music or video files. iPhones may also contain GPS technology for determining the location of the device.

## IV. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND/OR CELLULAR PHONES

11. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he/she often stores it in random order and with deceptive file names. The latter requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. Moreover, the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. As such, it is difficult to know prior to a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## V. SEARCH METHODOLOGY TO BE EMPLOYED

12. The search procedure of electronic data contained in computer hardware, computer

4

software, and/or memory storage devices may include the following techniques (NOTE: The following is a non-exclusive list, as other search procedures may be employed):

a. Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as listed in Attachment A;

b. Searching for and attempting to recover any deleted, hidden, and/or encrypted data to determine whether that data falls within the list of items to be seized as listed in Attachment A (any data that is encrypted and/or unreadable will be returned when law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c. Surveying various file directories and the individual files they contain;

d. Opening files in order to determine their contents;

e. Scanning storage areas;

f. Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

g. Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A;

h. I am requesting permission to have the analysis of the data done in the ordinary course of business of the agency that is performing the forensic analysis;

i. To obtain the data from the cell phone/mobile devices contained within this warrant utilizing a range of data analysis techniques. However, in some extreme cases, the cell phone may be damaged beyond repair, password locked or otherwise inoperable causing traditional data analysis techniques not to work. In these cases, you are granted permission to use an analysis technique referred to as "chip-off". "Chip-off" is a process where the BGA (Ball Grid Array or memory chip) is removed from the cell phone to allow the chip itself to be analyzed. This process renders the cell phone unusable, but preserves the actual content."

## VI. COMMERCIAL SEX TRADE AND THE USE OF CELLULAR PHONES

13. Through my training, experience, and consultation with other law enforcement

5

officers, I have learned that:

    a. I have investigated matters involving a violation of Title 18, United States Code, §§ 1591 and 1952. I have been trained regarding the investigation of these types of crime in which computers and cellular phones are used as a means for receiving, transmitting, and communicating in efforts to exploit victims, as well as services related to human-trafficking, which would include prostitution and other coerced commercial sex services.

    b. The development of computers, digital cameras, cellular telephones and the Internet has changed the way in which individuals involved in human-trafficking/prostitution interact with each other. Computers and storage devices for electronic media, cameras and cellular phones serve various functions in connection with human-trafficking/prostitution. They include: (1) advertisement (e.g., via Craigslist.com or Backpage.com); (2) communication (via email, Internet social media, cellular telephone or text) and (3) storage (pictures/images, electronic communications stored on computers, digital cameras and cellular telephones).

    c. Human traffickers and "pimps" can now store information and photographs related to their business enterprises on electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMS and DVDs as well as printouts or readouts from any magnetic storage device.

    d. Human traffickers and "pimps" can now transfer photographs directly to and from a computer. A device known as a modem permits a computer to connect to other computers through the use of telephone, cable, or wireless connection. Electronic contact can be made to millions of computers around the world. A "pimp" is a term typically used in reference to a man (sometimes a woman), who solicits customers for a prostitute or a brothel, usually in return for a share or all of the earnings that the prostitute makes.

    e. The computer's ability to store images (and other electronic data, i.e. emails and other forms of communication) in digital form makes the computer itself an ideal repository for human traffickers and individuals promoting prostitution. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of pieces of information and images at a very high resolution.

    f. The Internet affords individuals interested in human-trafficking/prostitution several different venues for viewing advertisements and communicating relatively anonymously in search for services.

    g. Organizers (like pimps) of human-trafficking/prostitution also utilize online resources to send and receive communications via services offered by Internet portals such as Yahoo and Hotmail, among others, and social media networking websites like Instagram, Twitter and Tagged.com. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of human-trafficking/prostitution can be found on the user's computer(s). Access to the services can also be done from a cellular telephone (i.e., smart phone, iPhone, etc.).

    h. As is the case with most digital technology, communications by way of computer or cellular telephone can be saved or stored on either device which is used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites such as "bookmarked" or "favorite" files. Digital information can also be retained unintentionally, such as traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or internet Service Provider client software, among others). In addition to electronic communications, a computer (and cellular telephone) user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence that shows that a computer contains specific software; when the software was installed; logs regarding the usage of the software; and even some of the files which were uploaded or downloaded using the software. Such information may be maintained indefinitely until overwritten by other data.

    i. Organizers (like pimps) of human-trafficking/prostitution also utilize multiple cellular phones and/or computer devices in order to (1) communicate with their commercial sex workers (prostitutes), (2) facilitate commercial sex dates, (3) to avoid detection by law enforcement and (4) to communicate with potential customers in the commercial sex trade.

    j. Human traffickers and pimps use digital cameras, digital video recorders and related media to take pictures and videos of their prostitutes. I further know that this is done for several reasons. Pimps post video and photographs to the Internet as a means of advertising their prostitutes. I further know that pimps are "collectors" and will retain these images and video as souvenirs. Pimps also will manufacture pornographic or sexually explicit videos and photos to satisfy their prurient interest.

14.   Based upon my training and experience, the training and experience of other

investigators with whom I have communicated, and police reports I have reviewed, electronic communication devices (cell phones, PDAs, computers, etc.) are permanently possessed by individuals involved in the commercial sex trade much the same way a legitimate business will use tools of its trade whether or not the business has a particular item in inventory on a given date. These items are kept by individuals involved in the commercial sex trade whether or not they are involved in or arranging for a criminal act at any given moment. I believe that the seizure of such items will provide evidence of the events set forth in this affidavit and that such files can be found within electronic devices described in Attachment A despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

### VII. BACKGROUND INVESTIGATION AND PROBABLE CAUSE

15. On June 29, 2018, the Saint Louis Metropolitan Police Department ("SLMPD") Human Trafficking Unit received information from an anonymous source regarding possible human trafficking occurring within the St. Louis area. The anonymous source stated his/her "client's" contact number, (636)328-8171, came back to an adult escort site. In addition, the anonymous source stated the "client," was approximately seven (7) months pregnant, appeared to have a developmental delay, and had a "caregiver" who identified himself as "Diamond".

16. An open source search of telephone number (636)328-8171, revealed a link to "Live Escorts Reviews," a website in which individuals can post commercial sex advertisements and individuals can purchase commercial sex acts based on those advertisements. A review of the website revealed approximately 200 times that telephone number (636)328-8171 solicited for sex since April 2018. The female depicted in the images was posed both partially and fully nude, with some of the images exposing her breast, vagina and anus.

17. On July 2, 2018, the anonymous source advised an SLMPD officer that the female posted in the commercial sex advertisements was his/her "client." The anonymous source also advised the client's address was 4551 Mary Avenue, St. Louis, Missouri, and that "Diamond" is an alias used by Jametric Steele ("Steele").

18. On July 17, 2018, SLMPD was dispatched to 4551 Mary Avenue in reference to a call for help. Upon arriving, Steele was present with six (6) adult females. Upon initial contact, the women did not disclose anything to the responding officers. However, the responding officers surmised Steele was controlling communication between the women and the officers. Following, members of the SLMPD's Human Trafficking Unit returned to the residence to conduct further investigation. Shortly thereafter, investigators contacted "Jane Doe 1," and she revealed Steele had assaulted her with a gun, which caused bruising to her face, which was observed by investigators. "Jane Doe 1" was also fearful that if she pursued criminal charges

8

against Steele for assault, he and/or the other women living at the residence would assault her.

19. During her interview, "Jane Doe 1" reported Steele facilitated commercial sex dates for the women living at the residence by posting advertisements on the internet, by making the women "work" on the streets, and by having the women work inside the front room of the residence. "Jane Doe 1" also reported Steele used physical force to discipline the women, and he would have one of the women in the house carry out the assault. Steele also used drugs to control the women, and the money generated from the commercial sex dates was given to Steele.

20. On July 17, 2018, Steele was arrested by SLMPD officers for failing to register as a sex offender.

21. On July 23, 2018, SLMPD Officer Tanya Rodman obtained a search warrant for 4551 Mary Avenue, 1st floor, St. Louis, Missouri, relative to an ongoing human trafficking, illegal possession of firearms and narcotics investigation. Upon execution of the state search warrant on July 27, 2018, investigators encountered "Jane Doe 2" who resided with Steele at 4551 Mary Avenue. Investigators asked "Jane Doe 2" if any weapons were present in the home; she hesitated, looked down and then said yes. She stated there were two (2) firearms in the rear bedroom of the house. One (1) in the bucket next to the television, and the other under the bed.

22. It should be noted that Officer Rodman (several days prior to the execution of the search warrant) reviewed multiple jail calls made by Steele from the St. Louis Justice Center. During Officer Rodman's review of the jail calls between "Jane Doe 2" and Steele, the word "bucket," was referenced during a discussion about moving something, and the words "thing" and "item" were referenced as being located in a bucket.

23. Investigators searched the house and the front room was in disarray, had little furniture and appeared to be used to engage in a lot of sexual activity. In the threshold area of the front door, in plain view, there were several used condoms, opened condom wrappers of different brands, tissue paper, baby wipes and an empty "Stree Overlord" (sperm generating pills) canister. There were also numerous personal and court documents and mail, as well as women's clothing, feminine hygiene products, identification cards and debit cards belonging to multiple females who were known to reside at 4551 Mary Avenue.

24. The rear bedroom of the residence had a bed, television, and an abundance of clothing through the room. "Jane Doe 2" identified this room as the bedroom she and Steele shared. Cell phones belonging to "Jane Doe 2" and Steele were located in the bedroom. In addition, investigators located a blue tote (referred to as a "bucket" by "Jane Doe 2") to the left of the television, which contained a black Sig Sauer .22

9

caliber Mosquito handgun, bearing serial number F041785, with a laser affixed and an empty magazine. Located under the bed was a unique silver and pink Phoenix Arms .25 caliber handgun, bearing serial number 3050601. Investigators surmised that the blue tote is the "bucket" discussed during the jail calls between Steel and "Jane Doe 2." A Missouri Driver's License and a prison identification card, belonging to Steele were also located in the bedroom. Additionally, the target telephone was also located in the bedroom.

25. On July 20, 2018, Steele made a phone call from the St. Louis Justice Center to telephone number (314)629-0595, to a female referred to as "Star." That phone number was previously identified as belonging to "Jane Doe 3." During the conversation Steele said he was incarcerated because he failed to register as a sex offender. The reason Steel was required to register as a sex offender was due to a previous criminal incident, in which he was charged with "Promoting Prostitution" and served twelve years in jail for "pimpin." Steele said "Jane Doe 3" and "Jane Doe 2" could "hustle" (earn money) out of the house. Steele's cell phone was at the house and "Jane Doe 3" could use it to "bump" her ad. Bump is a term used when posting advertisements on websites in which a person's ad goes directly to the top of the page to receive more views. Steele also let "Jane Doe 3" know she was upgraded to the second "queen on the board."

26. On July 20, 2018, Steele made a phone call to "Jane Doe 2." During the conversation, "Jane Doe 2" stated that "Jane Doe 3" was not trying to earn money and that "Jane Doe 3" left with a "trick" (a term used for a person who pays for sex acts.) Steele told "Jane Doe 2" to let "Jane Doe 3" back in the residence and earn money in the front room, just like "Jane Doe 2" does. Steele instructed "Jane Doe 2" to bump "Jane Doe 3's" ad from his phone.

27. On July 23, 2018, Steele made a phone call to "Jane Doe 2." During the conversation, "Jane Doe 2" told Steele that her date was on the way and she would earn $40. Towards the end of the conversation, "Jane Doe 2" rushed Steele off of the phone, stating, "Daddy, my date is here."

28. On July 24, 2018, Steele made a phone call to his daughter, who he referred to as "Baby Erica." After a brief conversation with "Baby Erica," another female got on the phone. During the conversation, Steele told the unidentified woman that he had thirteen girls and one queen on the "board." Steele stated he did not know what happened to his second queen on the board.

29. During the same July 24, 2018 conversation, Steel gave the phone to another inmate in jail, identified as "Andre," who was "Baby Erica's" boyfriend. Andre instructed her not to go to Steele's residence because her daddy (Steele) is a pimp.

30. On August 23, 2018, Steele arrived at the SLMPD to retrieve his driver's license,

social security card and debit card that were seized during the execution of the state search warrant. Sergeant Jatonya Clayborn-Muldrow met with Steele in the lobby of SLMPD. During their interaction, Steele stated he liked to help women by providing them with a safe place to live and to find employment, which depended on their "hustle." The term "hustle" is often used to describe providing sex acts in exchange for money.

31. Steele advised Sgt. Clayborn-Muldrow he has always been surrounded by women who wanted to work for him and take care of him. Steele said he currently had 13 "sugar mammas," who gave all of their money to Steele. Steele required the women to put their money together so the combined cash total equaled more. Steele was responsible for managing the money, which he used to provide the women shelter, food, clothing, hair weave, "boy" (heroin) and/or "girl" (crack cocaine). Steele was successful at persuading the women to give him their money without there being any animosity between them because the women understood their "positions" on the "board."

32. Throughout the conversation, Steele repeatedly attempted to recruit Sgt. Clayborn-Muldrow to work for him and told her that her "position" on the board would be determined by her "hustle." Steele said based on Sgt. Clayborn-Muldrow's appearance, she could "hustle" often if she was up to the task and could be his number one on his "A team," which was a new group of women Steele was organizing.

33. Steele went on to explain "Jane Doe 2" was his number one on the "board" because she never stopped "hustling." Steele's number two on the "board" was "Jane Doe 1." She recently moved to the house and quickly moved up in her "position" due to her "hustle." Steele stated "Jane Doe 4's" role was to be the "muscle" of the family. At the direction of Steele, Burns was responsible for physically disciplining the women when they did not do what they were expected to do.

34. Steele said the reason women needed his protection was because he had a fearless reputation in the neighborhood and was widely known as being a "pimp." Steele said he provided the women with a safe and clean place to "hustle." Steele allowed the women to use the front room of the house located at 4551 Mary Avenue to entertain the "dates," while he stayed in the rear of the residence, in his bedroom, in case something went wrong. Steele believed that being a part of his "family" greatly reduced the women's risk of danger.

35. On August 24, 2018, a federal complaint was filed in the United States District Court, for the Eastern District of Missouri (4:18CR748 CDP/DDN), against Steele for violation of Title 18, United States Code §922(g)(1), Felon in Possession of a Firearm.

36. On September 6, 2018, a Grand Jury sitting in the Eastern District of Missouri indicted the defendant in case No. 4:18CR748 CDP/DDN, on one (1) count of Felon in Possession of a Firearm in violation of Title 18 U.S.C. §922(g)(1).

37. Your affiant is aware through training and experience that persons in the sex trafficking industry use cell phones and computers to advertise victims on the internet in order to profit financially from illegal means.

38. Your affiant is aware through training and experience that oftentimes phone correspondence is used between traffickers, victims and potential clients to arrange meetings to exchange sex acts for money.

39. Based on my knowledge, training, and experience, as well as the facts from the present investigation, I also know that the digital media to be searched can contain correspondence and communications between multiple "Jane Does" and Steele, as well as pictures/images of locations of activities which occurred.

40. Based on my knowledge, training, and experience, I know that cellular telephones, computers, and digital media devices have the ability to hold phone books and photographs as well as a record of calls made and received.

## VIII. CONCLUSION

41. In view of the foregoing, there is probable cause to conclude that, in the digital media to be searched (attached list A) there will be located evidence of a crime, contraband, the fruit or instrumentalities of a crime, of one or more violation of Title 18, United States Code §§1591(a) and 2 (sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense), and §1952 (use of interstate facilities to promote, manage or facilitate prostitution). Accordingly, I respectfully request the issuance of a warrant to search the following digital media for the items on attached list A.

42. In order to prevent the compromise of this on-going investigation, affiant respectfully requests that the application, affidavit and search warrant be sealed.

Respectfully submitted,

Special Agent Jennifer Drews
Federal Bureau of Investigation

Subscribed and sworn to before me on October 24, 2018.

HONORABLE PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A
# LIST OF ITEMS TO BE SEIZED AND SEARCHED

1. Cellular telephone(s), cellular telephone hardware, cellular telephone software, cellular telephone related documentation, cellular telephone media, cellular telephone passwords and data security devices, which includes the items listed below:

    (a) a Black and Grey LG, Cell Phone, Model: LM-X210MA, Serial Number: 804CYCV809515, IMEI: 356233-09-809515-8, **"Cell Phone A,"**

2. All data files, including but not limited to graphic representations, containing matter pertaining to human-trafficking/prostitution, that is, visual depictions of females and males posed in sexually-explicit positions or engaging in sexually-explicit conduct; that is, visual depictions of U. S. currency, firearms and people posed with such items.

3. Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to human-trafficking/prostitution.

4. Any visual depiction, in any form, containing matter pertaining to human-trafficking/prostitution, which is a visual depiction of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

5. Electronic mail, chat logs, and electronic messages, offering to transmit through interstate or foreign commerce, including by United States mail or by computer, visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

6. All correspondence regarding the possession, distribution, sale or receipt of human-trafficking/prostitution.

7. Any correspondence pertaining to the persuasion, inducement, and/or enticement of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

8. Any and all correspondence offering to transmit through interstate commerce including by United States Mail or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

9. Any and all correspondence identifying persons transmitting, through interstate commerce including by United States Mail or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

1

10. Any and all records and ledgers bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission, through interstate commerce including by United States Mails or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

11. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce by United States Mail or by computer, or any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

12. All references to paperwork in this list of items to be seized includes records no matter how recorded.

## **DEFINITIONS**

The following terms have the indicated meaning in this affidavit:

a. Sexually explicit conduct means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person. 18 USC 2256(2).

b. Visual depiction includes undeveloped film and videotape, and data stored electronically which is capable of conversion into a visual image. 18 USC 2256(5).

c. "Cellular Telephone hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, SIM cards, memory cards and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d. "Cellular Telephone software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.

Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

e. "Cellular Telephone-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use various hardware, software, or other related items.